JUSTICE NELSON
dissents.
¶33 I am not able to join the Court’s Opinion.
I.
¶34 Should the District Court’s determination to revise the Attorney *53 General’s statements be reversed?
¶35 Before getting to the merits of the Court’s decision, I note that the Court appears to fault the Attorney General for not “immediately” answering the Proponents’ complaint. See ¶ 5. There is nothing in the law that requires the Attorney General to answer the Proponents’ complaint “immediately.” The record discloses that the Attorney General answered the Proponents complaint in a timely manner. Rule 12(a), M.R.Civ.P. Under this same rule, the Proponents could have moved to shorten the time for filing the Attorney General’s answer, but they did not do so. Indeed, the District Court, sua sponte, could have shortened the time for filing the State’s answer and, thus, further expedited the hearing and ruling on the Proponents’ challenge. See § 13-27-316(3)(a), MCA (mandating that “[t]he action [challenging the attorney general’s statement of purpose, implication of vote and fiscal statement] takes precedence over other cases and matters in the district court”). Yet, this matter proceeded through the court at the pace it did without any apparent objection from the Proponents. While the times for accomplishing court challenges under § 13-27-316, MCA, are extremely tight, given other provisions of Title 13, Chapters 2 and 3,[1] the finger of fault for any claimed delay should not be pointed at the Attorney General.
¶36 Turning now to this Court’s Opinion, the rationale and result of this Opinion is to disagree with the statements of purpose, the statements of implication, and the fiscal statement (hereinafter collectively referred to, where appropriate, as “the statements”) as redrafted by the District Court, and to agree with and to reinstate the statements drafted by the Attorney General. Aside from my disagreement with the Court’s decision in this regard, I note that in ¶¶ 1 and 15 of this Court’s Opinion we provide our own statements of purpose and effect of Cl 97. Since our decision here becomes the law *54 of this case,[2] one is left to wonder whether this Court has, as a matter of law, now altered the statement of purpose of the Attorney General. If this Court is approving a statement of the Attorney General over that of the District Court, we ought not to insert yet a third statement, our own, into this mix-especially where this Court’s statement likely trumps the other two.
¶37 Turning next to the statutes at issue here, §§ 13-27-310 through -316, MCA, may be summarized in the following fashion:
(a) The Attorney General is charged with the responsibility for drafting the statements which are to be placed on the circulation petition and on the official ballot. Sections 13-27-312 and - 316(3)(b), MCA.
(b) If either the proponents or opponents of the petition disagree with the Attorney General’s statements, they may file a challenge in the Lewis and Clark County District Court requesting that the court “alter the statement or modify the attorney general’s determination.” Section 13-27-316(1), MCA.
(c) The statement certified by the court must be placed on the petition which will be circulated and on the official ballot. Section 13-27-316(3)(b), MCA.
¶38 With this statutory scheme in mind, we state in ¶ 10 that “mixed questions of law and fact” are presented to this Court. I am not clear from the Court’s Opinion what “facts” are at issue here or are even relevant. While the District Court held a hearing before making its decision,[3] it appears from the Clerk of Court’s docket entries that the hearing was not held to receive factual evidence, but rather, was held simply to receive oral argument on the parties’ respective legal positions and on the trial court’s statutory authority to review and alter the Attorney General’s statement. The record does not disclose any “fact-finding” by the trial judge. And, not surprisingly, this Court’s Opinion does not refer to any material “facts” which are implicated in its decision. The language of the statements of the Attorney General and that of the District Court are undisputed. They are what they are.
¶39 In this regard, the Court’s error in articulating and applying the mixed law and fact standard of review is two-fold.
*55 ¶40 First, as noted above, no “facts” are being reviewed as the trial court did not find any facts. The District Court’s decision was purely a legal assessment of the Attorney General’s statements, which language is not in dispute. As is with the review of any legal error, the proper standard is de novo or plenary. In re Marriage of Robison, 2002 MT 207, ¶ 15, 311 Mont. 246, ¶ 15, 53 P.3d 1279, ¶ 15. The District Court’s task was simply to determine whether the Attorney General’s statements met the statutory requirements of § 13-27-312, MCA. The trial judge has no discretion to simply insert her language in place of the Attorney General’s because she thinks it might read better or make more sense. Under § 13-27-316(3)(a), MCA, the courtis to “examine the proposed measure and the challenged statement or determination of the attorney general and... certify to the secretary of state a statement which the court determines will meet the requirements of 13-27-312 or an opinion as to the correctness of the attorney general’s determination.” This determination must, of necessity, be made by examination of the language of the measure itself and the information provided by the budget director pursuant to § 13-27-312(1), MCA. It is a legal determination, not a factual one.
¶41 Second, it is the District Court’s legal conclusions about why the Attorney General’s statements do not pass statutory muster that is critical to its decision and to our review. If the District Court’s legal conclusions in this regard are correct, then the language that the trial court substituted for that language used by the Attorney General must be reviewed to insure that the court’s language is legally correct. Both of these inquiries are legal determinations, not factual ones.
¶42 Section 13-27-312, MCA, offers scant guidance to an attorney general attempting to comply with its provisions. With the advice of the parties, § 13-27-312(2), MCA,[4] requires a statement explaining the purpose of the measure and statements explaining the implications of a vote for or against the measure, and § 13-27-312(3), MCA, requires a fiscal statement prepared from information furnished by the budget director under § 13-27-312(1), MCA. Section 13-27-312(4), MCA, imposes the obligation on the attorney general that the statements be truthful and impartial, easily understood, not argumentative, and not prejudicial for or against the measure.
¶43 At this point, it is useful to compare the two statements of purpose at issue. The Attorney General’s statement of purpose reads:
*56 The Montana Constitution currently prohibits appropriations by the legislature that exceed anticipated revenue. This measure adds a constitutional spending limit that would prohibit increases in appropriations greater than the combined growth rate of population and inflation. It allows appropriations up to the largest spending limit for any previous biennium. Emergencies, debt payments, pro-rata tax rebates, various appropriations expressly provided by the Montana Constitution, and expenditures from funding sources including the federal government, constitutionally created trusts, and certain user fees are not included in the spending limit. The legislature may exceed the spending limit only with voter approval.
Conversely, the District Court’s reiteration of the Attorney General’s statement of purpose states:
This measure restricts increases in state government spending by adding a spending limit to the Montana Constitution. Total increases in appropriations by the legislature would be limited to the combined change in population and inflation, unless the spending limit for any previous biennium would be higher. The legislature could not exceed this limit without voter approval. Exceptions include, generally, federal monies, constitutionally created trusts, emergencies, debt payments, highway revenues, and some user fees. Any Montana resident or business could sue to enforce the measure and, if successful, receive costs and attorney fees. The measure would apply to the next legislature.
¶44 At ¶ 14 of this Court’s Opinion, we fault the District Court for concluding that the Attorney General’s statement of purpose was untrue. That, of course, is one of the determinations under the statute, the District Court Judge was obligated to make. So why is the trial court’s conclusion incorrect as a matter of law? Our answer, found at ¶¶ 15 and 16, is in this Court’s substituted determination of the purpose of the initiative and the appropriate language that should be included in the statement-which as noted before, is different than either the Attorney General’s or the District Court’s. The mere fact that this Court disagrees with the legal conclusions of the District Court does not explain why the latter court’s conclusions are wrong as a matter of law. There is a complete lack of analysis in the Court’s Opinion on this point.
¶45 The District Court grounded its decision in its comparison of the actual text of the measure with the Attorney General’s use of “growth rate” of population and inflation not found in the text. For that reason, *57 the District Court substituted the word “change” which is actually found in the text of the measure. Moreover, pursuing that same approach, the District Court Judge observed that the Attorney General omitted salient provisions of the measure needed to make the statement of purpose true-as § 13-27-312(4), MCA, plainly requires. In the context of the statutory scheme, a “true” statement is not one that is simply not false. A partial statement, while containing no false information itself, may not be “true” without the inclusion of other information that accurately represents the language of the measure. While “truth” may be a somewhat subject concept, we, at least, owe the parties and the trial court some definition of what constitutes a true statement under the statutory scheme.
¶46 However, as noted, this Court’s Opinion offers no legal analysis or rationale explaining why the District Court’s conclusions and language are legally incorrect. This Court simply spins its decision with its own reiteration of what it thinks is the initiative’s purpose.
¶47 Indeed, this Court concedes at ¶ 18 that the District Court’s conclusions are not “patently wrong” and suggests that the trial judge’s statement might even be “preferable” to the Attorney General’s statement.[5] That begs the obvious question, if the District Court Judge is not “patently wrong” and if her statement of purpose might even be “preferable” to the Attorney General’s, then why are we reversing the trial court? How wrong, exactly, or right does she have to be? The statutory scheme requires the statements to be “true,” “easily understood,” not argumentative, and not prejudicial. Section 13-27-312(4), MCA. Why the District Court’s statements failed to meet these statutory criteria and why the Attorney General’s do, is not explained in the Court’s Opinion.
¶48 However, the reason for this lapse is likely in this Court’s preference for its own reiteration of the statement of purpose-see ¶¶ 1 and 15-and its preference for this statement of purpose as being more in line with the Attorney General’s. Indeed, the Court’s insertion of its own view into this matter, at the expense of its review of the District Court’s decision for actual legal error, is manifest in the Court’s further holding that the Attorney General’s statement of purpose is also in “plain, easily understood language that is not drafted so as to create prejudice for or against the measure,” see ¶ 18-grounds *58 that were not even addressed by the District Court, see ¶ 14. The trial court ruled only that the Attorney General’s statements were not true.
¶49 Our enthusiasm for reversing the District Court and reinstating the Attorney General’s language in the statement of purpose has, unfortunately, led to this Court substituting its judgment for that of the trial court. What is lacking in this Court’s Opinion is any analysis and discussion of the actual language of the measure and how that language is best summarized so as to fulfill the statutory requirements of § 13-27-312(4), MCA-i.e., so that, within the context of the measure, the statement of purpose is “true,” “impartial,” written in “plain, easily understood language,” and not argumentative or so as to “create prejudice for or against the measure.” We owe it to the Attorney General and the District Court Judge to perform this analysis, and our failure to do so leaves the Court’s decision as little more than the majority’s gut reaction that the Attorney General’s language is good enough for government purposes. That really is no decision at all; we establish no legal precedent as to how these sorts of disputes should be resolved in future challenges, leaving, instead, each to be decided on the sort of shoot from the hip approach used here.
¶50 As to this Court’s discussion of the statements of implication of vote and the fiscal statement, but without going into the detail of those, I, likewise, reach the same conclusions as to this Court’s failure to properly analyze the trial court’s language vis-a-vis the Attorney General’s language given the requirements of § 13-27-312(4), MCA, the information provided by the budget director, and the language of the measure. Without more, I conclude that the District Court properly exercised its statutory authority and obligation under § 13-27-312(4), MCA, to render the statements truthful-again, grounded in its conclusion that the Attorney General’s statements did not track the textual language or the effect of the measure itself. Indeed, I agree with the District Court that the Attorney General’s fiscal statement, see ¶ 23, would be misleading and confusing to the ordinary lay petition-signer and voter. Again, as with its holding in ¶ 18, the Court concludes that the Attorney General’s statement is good enough-it is “satisfactory, if not perfect,” see ¶ 29-and thus suffices to pass statutory muster. Why the trial court’s determination to rewrite the fiscal statement based on the text of the measure is legally incorrect is not explained in the Court’s Opinion, however.
¶51 Summarizing my dissent with respect to this Court’s reversal of the District Court’s determination to rewrite the Attorney General’s statement, this Court’s Opinion at once concedes that the trial judge *59 was not “patently wrong”; that her reiteration of the statements might even be preferable; that the Attorney General’s statements were only satisfactory and adequate, though not perfect; and that the Attorney General’s statements are correct (because this Court’s own restatement of the purpose, implication and fiscal implications of the measure are closer to those of the Attorney General’s). There is no explanation of why the District Court’s determinations-grounded in the actual text of the measure itself and information provided by the budget director-are incorrect, as a matter of law. We have failed in our obligation to conduct a de novo review of the trial court’s legal conclusions. Rather, we have simply substituted our judgment-and our re-iteration of the statements-for those of the trial judge. We give no legal guidance to the district courts or to the Attorney General, and we establish no parameters for future similar challenges.
¶52 Accordingly, I dissent from the Court’s decision. I would affirm the District Court.
II.
¶53 Should signatures collected on illegal circulation petitions he declared invalid?
¶54 Since I would affirm the District Court on the first issue, that leads me to the place where I must part company with the District Court on the second issue. The Attorney General argues that if his statements are held not to satisfy § 13-27-312, MCA,-i.e., if the District Court is affirmed-then the signatures collected by the Proponents on petitions using the Attorney General’s statements may not be counted in qualifying the constitutional initiative to appear on the ballot. Primarily, the Attorney General relies on § 13-27-316(3)(b), MCA, contending that the statutory scheme requires that Proponents’ ballot statement disputes be resolved before signature gathering so that no signatures are obtained by means of an illegal petition.
¶55 The trial judge ruled that the statements on the petition and the statements on the official ballot could be different because the “statements contained on the circulating petitions are [not] so inaccurate or misleading as to warrant invalidating signatures already gathered.” The District Court relied on State ex. rel. Boese v. Waltermire (1986), 224 Mont. 230, 730 P.2d 375. However, as the Attorney General points out, that decision is inapposite because there the proponents’ challenge to the Attorney General’s ballot statements was resolved before the petition was circulated to the voters. The statements on the petition for circulation and on the official ballot were *60 the same. Boese, 224 Mont. at 231, 730 P.2d at 376.
¶56 Moreover, the District Court Judge reasoned here that
the accuracy of the statements is more critical to the voter in the voting booth than to voters signing the petition. The ballot does not contain the actual text of the initiative, so these statements are the only information presented to voters at the time of choosing how to vote on the measure. Signers of the petition, however, have available to them the full text of the initiative and, in addition are deciding whether to place the measure on the ballot, not whether they actually wish to enact it.
¶57 The Proponents advance a similar line of reasoning as the District Court’s, quoting the foregoing paragraph. Additionally, the Proponents state that “[s]igners of the petition also have the benefit of being able to ask questions about the measure from the people gathering the signatures.” Finally, Proponents argue that invalidating the signatures violates their constitutional right to seek full legal redress from the courts. As to this last argument, Proponents reason that if they cannot collect signatures until the District Court and the Supreme Court finally rule on their challenges, they are not provided sufficient time and opportunity to obtain enough signatures under the rewritten statement of purpose, thereby preventing them from placing the measure on the November ballot. This situation, according to Proponents, forces citizens to choose between pursuing their right under § 13-27-316(1), MCA, to petition the district court for redress, or to not seek redress so that signatures can be collected without being invalidated. Proponents also argue that there is no statutory provision that requires them to obtain a final decision from the District Court and from this Court before beginning to gather signatures.
¶58 Neither the District Court nor the Proponents are correct. The trial court’s conclusion that the “statements contained on the circulating petitions are [not] so inaccurate or misleading as to warrant invalidating signatures already gathered” begs the fundamental question. If, in fact, the trial judge’s reasoning is correct, then why did the court invalidate the statements of the Attorney General in the first place? The statements cannot on the one hand be so untruthful, inaccurate and misleading as to prevent them from being on the ballot, yet, at the same time, be not so untruthful, not so inaccurate and not so misleading so as to prevent them from appearing on the petition for circulation. Either the statements are true, accurate and not misleading or they are not. If, indeed, there is no material or substantive difference in the language substituted by the court for that *61 of the Attorney General’s, then this entire litigation and appeal simply exalts form over substance in violation of § 1-3-219, MCA; it is nothing more than an exercise in elevating the sublime over the ridiculous.
¶59 The statutory scheme enacted by the Legislature clearly and unambiguously requires: (a) that the statements be “true,” “impartial,” written in “plain, easily understood language,” and not argumentative or so as to “create prejudice for or against the measure,” § 13-27-312(4), MCA, and (b) that the statements certified by the court-here, this Court’s own statement or the Attorney General’s (I am unsure)-“rausi be placed on the petition for circulation and on the official ballot.” Section 13-27-316(3)(b), MCA (emphasis added). There is nothing in the statutory scheme that allows the statements on the petition for circulation and on the official ballot to be different. Indeed, § 13-27-316(3)(b), MCA, clearly and unambiguously requires precisely the opposite.
¶60 The District Court’s and Proponents’ reasoning that the accuracy of the statements is more critical to the voter in the voting booth than to voters signing the petition is fallacious. As noted, the trial court and Proponents observe that because the ballot does not contain the actual text of the initiative, the statements are the only information presented to the voters at the time of choosing how to vote on the measure. According to the District Court and the Proponents, signers of the petition, on the other hand, have available to them the full text of the initiative and, in addition, are deciding whether to place the measure on the ballot, not whether they actually wish to enact it.
¶61 As noted above, the flaw in this line of reasoning is that it ignores the plain and unambiguous requirement of the statutory scheme that the statements on the circulation petition be “true,” “impartial,” written in “plain, easily understood language,” and not argumentative or so as to “create prejudice for or against the measure” and that the statements be the same on both the petition for circulation and on the official ballot. Sections 13-27-312(4) and -316(3)(b), MCA. The trial court’s and Proponents’ rationale is that untruthful, partial, argumentative, not easily understood, and prejudicial statements can be on either the circulation petition or the ballot; it does not matter. That is not what the black-letter law allows, however.
¶62 It is also black-letter law-so often cited that the cases are legion-that
[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit *62 what has been inserted.
Section 1-2-101, MCA. It is this Court’s and every court’s “duty ... to construe the law as it is written.” In re Estate of Magelssen (1979), 182 Mont. 372, 378, 597 P.2d 90, 94 (citing § 1-2-101, MCA). Moreover, “[i]n the construction of a statute, the intention of the legislature is to be pursued if possible.” Section 1-2-102, MCA. In ascertaining the Legislature’s intent, “it is beyond dispute that... we are bound by [the] plain and unambiguous language used in a statute and may not consider legislative history or any other means of statutory construction,” McKirdy v. Vielleux, 2000 MT 264, ¶ 22, 302 Mont. 18, ¶ 22, 19 P.3d 207, ¶ 22 (citing MacMillan v. State Compensation Ins. Fund (1997), 285 Mont. 202, 208, 947 P.2d 75, 78), absent there being an ambiguity in the statute. “If no ambiguity exists in a statute, the letter of the law will not be disregarded under the pretext of pursuing its spirit.” Magelssen, 182 Mont. at 378, 597 P.2d at 94 (citing Vaughn & Ragsdale v. State Board of Equalization (1939), 109 Mont. 52, 60, 96 P.2d 420, 424).
¶63 On the one hand, Proponents demand that the courts follow the law when it is to their benefit, but they demand that the courts ignore the law when it is not to their advantage. Such an argument is disingenuous; Proponents cannot have it both ways. Indeed, in ignoring the fundamental rules of statutory construction, the Proponents urge a judicially-activist, result-oriented approach upon the courts.
¶64 Similarly, Proponents’ argument that “[s]igners of the petition also have the benefit of being able to ask questions about the measure from the people gathering the signatures” is even more untenable. In the first place, nothing in the statutory scheme even remotely suggests that petition signers are to obtain information about the measure from the signature gatherers. The statutes enacted by the Legislature require that petition signers and voters alike, be informed about the measure from the approved and identical statements on, respectively, the petition for circulation and the official ballot. Sections 13-27-312 and -316(3)(b), MCA.
¶65 In the second place, the implicit argument that signature gatherers are competent to truthfully and impartially explain to potential petition signers the purpose, fiscal impact, and vote implications of a complex, proposed constitutional amendment such as the one at issue here (it covers three pages, single spaced, and is written in legalese) is patently ludicrous. Signature gatherers typically are not attorneys. Many are volunteer lay persons and some are hired, *63 often from out of state, to obtain signatures for pay. Collective common experience is that most professional signature gatherers do not have a clue about what they are asking people to sign. The simplistic explanations of a measure given by such persons, in a legal sense, are typically neither true nor impartial, but rather, are prejudicial and misleading-all contrary to the legislative scheme discussed above. Signature gatherers, by definition, volunteer or are hired and paid to promote the petition, argue for it and encourage people to sign it. A fortiori, signature gatherers’ statements are prejudiced in favor of the measure-contrary to what § 13-27-312(4), MCA, specifically requires.
¶66 Indeed, when such persons give legal interpretations of the purpose, voting implications and fiscal effects of a measure, it is likely that they are engaged in the unauthorized practice of law in even giving such advice. See § 37-61-201, MCA.
¶67 Common experience is also that neither typical petition signers nor voters have read, much less understand, the entirety of a proposed constitutional amendment as lengthy and as complex as the one at issue here. It is precisely for this reason that the peoples’ representatives in the Legislature enacted a statutory scheme requiring identical statements on both the petition for circulation and official ballot that me “true,” “impartial,” written in “plain, easily understood language” and not argumentative or so as to “create prejudice for or against the measure.” Sections 13-27-312(4) and - 316(3)(b), MCA. Proponents’ arguments to the contrary, this legislative scheme does not envision that petition signers will be fairly or intelligently informed about the measure from the very people who, voluntarily or for pay, are promoting the measure. The Legislature determined that both petition signers and voters be informed about the measure from the same source-the identical, approved statements authorized by §§ 13-27-312 and -316(3)(b), MCA.
¶68 Again, Proponents’ argument urges the courts to ignore the plain language of the statutes and to adopt an activist, result-oriented approach that works to their advantage.
¶69 The statutes at issue may not be simply ignored because the District Court believes the statements it rejected are “true enough” for the petition but “not true enough” for the ballot. The legislative scheme does not permit this result, but rather, requires precisely that the statements on the petition for circulation and on the official ballot be the same. Section 13-27-316(3)(b), MCA. Nor may Proponents demand that the courts ignore the law because, having won their challenge in the District Court, they must now live with the adverse consequences *64 that flow from their victory. The law cannot be applied in such a Pharisaical manner.
¶70 Finally, Proponents’ argument that enforcing the law deprives them of their right of access to the courts is equally without merit. In point of fact, Proponents have had full access to the courts in this case. If the legislative scheme requires time frames that are difficult to negotiate and which are unrealistic (and as I have noted above, that may be the case) then Proponents’ remedy is to challenge the constitutionality of the statutory scheme or to seek legislative amendment of the offending statutes. Proponents may not seek to have the District Court or this Court simply legislate from the bench and ignore statutes not to the Proponents benefit or liking. As stated above, this approach simply urges courts to be activist and result-oriented.
¶71 On this issue, I would reverse the District Court, and I would invalidate petitions which contain the untrue, misleading and inaccurate language that the District Court revised.
¶72 On the basis of the foregoing, I dissent.

 With due respect, the Legislature should comprehensively review the statutory time frames for the whole initiative process. These time frames are unrealistic given the time it takes to formulate and obtain review of the proposed language for the petition, file and conclude court challenges and appeal, if any, and then circulate a petition with the approved statements so that both the statements on the petition and the ballot willbe the same. See § 13-27-316(b), MCA. Moreover, the statutorily-imposed word limitations in § 13-27-312(2), MCA, for the various statements-100 words for the statement of purpose; 25 words each for the statements of implication; and 50 words for the fiscal statement-are equally unrealistic given the complexity of citizen initiatives-CI 97 being only one recent example. If the statements on the petition and ballot are truly intended to inform petition signers and voters in making an intelligent choice, then such statements must be sufficiently complete and understandable to accomplish that goal. The arbitrarily short word limitations imposed in the statutes frustrate that goal.

 See Moody v. Northland Royalty, Co. (1997), 286 Mont. 89, 92-93, 951 P.2d 18, 21-22 (whether right or wrong, the Supreme Court’s decision is the law of the case, is a final determination, will not be reopened, and is binding upon the parties).

 No transcript of that hearing has been presented to this Court.

 I do not reiterate here the matter of the word limitations set forth in these statutes, which, as noted above, I suggest are wholly unrealistic.

 Ironically, the Court then goes on to suggest that this Court or individual Justices might even do a better job of drafting. Acting on its own suggestion, unfortunately, this is what the Court does at ¶¶ 1 and 15.